**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

ROBERT W. HAYNES, JR.,

        Plaintiff,

vs.                                No. CIV 09-527 WJ/GBW

ALVIN DOMINGUEZ, District Engineer for
NEW MEXICO DEPARTMENT OF
TRANSPORTATION,

        Defendant.

**MEMORANDUM OPINION AND ORDER GRANTING SUMMARY JUDGMENT**

THIS MATTER comes before the Court on *Defendant Alvin Dominguez's Motion for Summary Judgment*, filed November 15, 2010 (Doc. 71).  The Court has reviewed the motions and briefs submitted by the parties, and the relevant authorities.  The Court concludes that the motion for summary judgment should be granted.

**BACKGROUND**

Pro se Plaintiff Robert W. Haynes, Jr. was employed as a traffic technician by the New Mexico Department of Transportation ("NMDOT") from December 28, 1998 through May 31, 2007, and was assigned a NMDOT vehicle.  *See* Doc. 71, Ex. B (Doc. 71-3) ("Ex. B") at 6, and Ex. C, Haynes' October 1, 2010 Deposition  (Doc. 71-4) ("Haynes Dep.") at 64:08-64:14 at 4.  Aaron Chavarria was Haynes' supervisor at the time of his termination.  *See* Haynes Dep. at 52:09-52:11 at 2.

The termination letter focused on the events surrounding a speeding citation Haynes received on March 23, 2007 and damage Haynes caused to a state vehicle on April 3, 2007 as the main bases

for the disciplinary action. *See* Ex. B at 6-7. The following are the additional reasons, as described in the Complaint, for Haynes' termination: "a) [a] traffic citation issued to the Plaintiff for speeding on July 22, 2002, where the speeding charge was dismissed by the court; b) [a] speeding citation issued to Plaintiff on September 11, 2003, where the citation was dismissed by the court; c) [t]hree (3) unverified citizen complaints in 2006, where unknown persons called to complain that the Plaintiff was speeding." Doc. 1 ("Compl.") ¶ 19, at 4. *See* Ex. B at 6.

On March 23, 2007, during work hours, Haynes received a traffic citation for speeding while driving his assigned state vehicle. *See* Haynes Dep. at 73:01-73:04 at 6. Haynes asserts that the speeding was caused by the vehicle's throttle being stuck. *See* Haynes Dep. at 73:05-73:09 at 6. Haynes immediately reported the citation to his superior and told his supervisor about the alleged throttle problem. *See id.* at 73:10-73:13 at 6. Haynes pleaded guilty to the citation and paid the related fine. *See* Compl. ¶ 14, at 3. Haynes had the vehicle inspected by motor pool but they found no problem with the throttle. *See* Doc. 71, Ex. E (Doc. 71-6) (Vehicle Work Orders) at 1. One of the state mechanics, Tony Galindo, did, however, allegedly tell Haynes that there was a possibility that the throttle could have become stuck. *See* Haynes Dep. at 73:22-74:06 at 6-7. On April 3, 2007, at Chavarria's insistence, the vehicle was again inspected by motor pool; no problem was found with the throttle. *See* Haynes Dep. at 73:10-75:16; Vehicle Work Orders at 2. On April 5, 2007, the vehicle was also sent to a Ford dealership for inspection, but it found no problem with the throttle. *See id.* at 75:9-75:19 at 7; Vehicle Work Orders at 3.

On April 3, 2007, Haynes drove a state-owned truck into the carport at his home, damaging the "head ache rack, light bar and truck bed" of the vehicle. Ex. B at 7. *See* Haynes Dep. at 76:8-76:16 at 7; Doc. 71, Ex. F (Doc. 71-7) ("Prieto Aff.") ¶¶ 2-5, at 1. Haynes had temporarily exchanged vehicles with another employee, Andrew Prieto, who had been assigned the truck. *See*

2

Haynes Dep. at 75:23-76:11 at 7; Prieto Aff. ¶ 2, at 1.  Haynes did not immediately report the accident.  *See* Haynes Dep. at 76:17-76:19 at 7.  He reported the truck damage to his supervisor the next day, but only after he was confronted by Prieto and Prieto told Haynes that he had reported the damage.  *See* Prieto Aff. ¶¶ 8-10, at 1-2.

On May 12, 2002, Haynes was cited for speeding in a NMDOT vehicle; as discipline, he was suspended from work for one day.  *See* Doc. 71, Ex. G (Doc. 71-8).  On September 11, 2003, due to receiving another traffic citation, Haynes' pay was reduced by fifteen percent for one-hundred-sixty hours.  *See* Haynes Dep. at 69:21-70:23 at 5-6; Doc. 71, Ex. H (Doc. 71-9).

Prior to Haynes' termination, three citizens complained to law enforcement officials about his driving.  *See* Haynes Dep. at 71:13-72:24 at 6.  A private citizen report on June 12, 2006, stated that Haynes' state vehicle was traveling 85 mph in a 65 mph zone, and Haynes received a written notice for speeding on July 31, 2006.  *See id.* at 71:18-23 at 6; Doc. 71, Ex. I (Doc. 71-11).[1]  A private citizen report on November 16, 2006, complained that Haynes' state vehicle was being driven recklessly, speeding and weaving in and out of traffic.  *See* Doc. 71, Ex. J (Doc. 71-11).  A police officer pulled Haynes over and cautioned him about his driving.  *See id.*; Haynes Dep. at 71:24-72:14 at 6.  A private citizen report on November 21, 2006, asserted that Haynes was driving a state vehicle recklessly near Silver City.  *See* Doc. 71, Ex K (Doc. 71-12).  A police officer pulled the vehicle over and cautioned Haynes about his driving.  *See* Haynes Dep. at 72:15-72:24 at 6.

Prior to this time, on February 7, 2001, Haynes also received a speeding ticket while driving a state vehicle and the related case was heard in Bayard Magistrate Court.  *See* Doc. 71, Ex. L (Doc.

---

[1]The notice recapped his two prior traffic violations and the disciplinary actions taken.  *See* Doc. 71, Ex. I.  Haynes stated that he does not remember if it was him that was reported.  *See* Haynes Dep. at 114:18-114:19 at 12.  He stated: "I was driving the vehicle, but I don't know if I was in that specific area at the time."  *Id.* at 114:20-114:23 at 12.

71-13).  Haynes does not recall this citation.  *See* Doc. 79 ¶ 7, at 4.

On May 29, 2007, Dominguez, on behalf of NMDOT, sent to Haynes the letter advising him that he was terminated effective May 31, 2007.  *See* Ex. B at 6.  Haynes appealed his termination to the Personnel Board of the State of New Mexico, which conducted a hearing on October 3 and 4, 2007.  *See id.* at 1 and 5.  The Board upheld the termination.  *See id.* at 1.[2]

On May 29, 2009, Haynes filed his *Complaint for Violation of Civil Rights Pursuant to 42 U.S.C. §§ 1981 and 1983*, alleging "retaliation and racial discrimination contrary to 42 U.S.C. § 1983 and other federal law," and "discriminatory and unlawful interference with the Plaintiff's rights of employment contract under 42 U.S.C. § 1981," and requesting punitive damages.  *See* Compl. Haynes does not recall having a specific employment contract with NMDOT.  *See* Haynes Dep. at 117:2-117:7 at 12.

## LEGAL STANDARDS

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (2010 Rev. Ed.).  Upon the movant's proper showing that no genuine dispute of material fact exists, the opposing party "'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting former Fed. R. Civ. P. 56(e)).  An issue of fact is genuine if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the non-moving party.  *See id.*  Mere assertions or conjecture

---

[2]It appears that Haynes also filed a claim with the Equal Employment Opportunity Commission ("EEOC").  *See* Doc. 71 at 1; Doc. 71, Ex. R (Doc. 71-19) at 2.  No further information or documents were submitted with regard to an EEOC claim.

4

of factual disputes are not enough to survive summary judgment.  *See Branson v. Price River Coal Co.*, 853 F.2d 768, 771-72 (10th Cir. 1988).  The party seeking summary judgment has the

> initial burden to show that there is an absence of evidence to support the nonmoving party's case.  Once [the movant] meets this burden, the burden shifts to [the non-moving party] to identify specific facts that show the existence of a genuine issue of material fact.  The party opposing the motion must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.

*Thomas v. Int'l Bus. Machs*, 48 F.3d 478, 484 (10th Cir. 1995) (citations and internal quotations omitted).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1) (2010 Rev. Ed.).  To warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial. *See id.*; *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999).  It is not the court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  *See Anderson*, 477 U.S. at 250.  Rather, the court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes

5

all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor. *See id.* at 254.

### A.    42 U.S.C. § 1983

Section 1983 authorizes an injured person to assert a claim for relief against a person who, acting under color of state law, violated the claimant's federally protected rights. *See West v. Atkins*, 487 U.S. 42, 48 (1988).  Accordingly, to state a valid claim under § 1983, a plaintiff must allege: (i) a deprivation of a federal right; and (ii) that the person who deprived the plaintiff of that right acted under color of state law.  *See id.*

The Equal Protection Clause of the Fourteenth Amendment grants to all citizens the "right to be free from invidious discrimination in statutory classifications and other governmental activity," *Harris v. McRae*, 448 U.S. 297, 322 (1980), and requires that state governments treat certain similarly situated persons in a similar manner.  *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).[3]

To state a claim under the Equal Protection Clause, the plaintiff must demonstrate that a state actor had a racially discriminatory intent or purpose.  *See Villanueva v. Carere*, 85 F.3d 481, 485 (10th Cir. 1996).  There must be proof of intentional discrimination.  *See Reynolds v. School Dist. No. 1 Denver, Colo.*, 69 F.3d 1523, 1536 (10th Cir. 1995).

[P]urposeful discrimination requires more than 'intent as volition or intent as

---

[3]Title VII provides a means for employees and former employees who are victims of discrimination to sue their employers.  Employment discrimination under Title VII along with other relevant federal statutes covers discrimination on the basis of such broad categories as sex, pregnancy, disability, age, race, color, religion, or national origin.  Lawsuits under Title VII require first that the alleged victim exhaust his or her administrative remedies.  *See Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver*, 397 F.3d 1300, 1314 (10th Cir. 2005).  Haynes was represented by counsel at the time he filed his Complaint.  He is now proceeding pro se.  The Complaint makes no reference to Title VII.

awareness of consequences.'  It instead involves a decisionmaker's undertaking a course of action 'because of, not merely in spite of,' [the action's] adverse effects upon an identifiable group.

*Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1948 (2009) (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)) (modifications in original).

### B.      42 U.S.C. § 1981

Section 1981 of Title 42 of the United States "clearly prohibits discriminatory conduct that occurs both before and after the establishment of [a] contractual relationship." *Perry v. Woodward*, 199 F.3d 1126, 1132 (10th Cir. 1999).  "[T]o establish a prima-facie case of discrimination under § 1981, a plaintiff must show: (1) that [he] is a member of a protected class; (2) that the defendant intended to discriminate on the basis of race; and (3) that the discrimination interfered with a protected activity as defined in § 1981." *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1101-02 (10th Cir. 2001).  Notably, "[t]he action interfered with must be based on a contract." *Id.* at 1101.  Like a § 1983 claim, under § 1981, the claimant must show that a defendant intentionally or purposefully discriminated against him or her.  *See Reynolds v. Sch. Dist. No. 1, Denver, Colo.*, 69 F.3d 1523, 1532 (10th Cir. 1995).  Intentional discrimination must be established through either direct or circumstantial evidence.  *See Kendrick v. Penske Transp. Servs, Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000).  In New Mexico, an at-will employee without a written employment contract nevertheless has a contractual relationship with an employer because the employee rendered services in exchange for wages.  *See Perry*, 199 F.3d at 1133.

### C.      McDonnell Douglas Burden-shifting Analysis

Because direct evidence is not always available to prove discrimination, the Supreme Court set forth the framework for assessing circumstantial evidence of discrimination in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Regardless of whether a plaintiff is alleging

discriminatory discharge on the basis of race pursuant to Title VII, 42 U.S.C. § 1983 or § 1981, he or she must establish the same elements in order to make out a prima-facie case under the *McDonnell Douglas* burden-shifting analysis.  *See Drake v. City of Fort Collins*, 927 F.2d 1156, 1162 (10th Cir. 1991).  The Court, therefore, will discuss relevant Title VII,[4] § 1983 and § 1981 cases decided by the Tenth Circuit in addressing the appropriate formulation of the prima-facie case in the discriminatory-discharge context.

The three-part burden-shifting framework for evaluating discrimination claims requires that first, the employee make a prima-facie case of discrimination by showing: (1) he is a member of a protected class; (2) he applied for and was qualified for the position; (3) despite being qualified, he was rejected; and (4) the position remained open or was given to another employee of the same or lesser qualifications.  *See McDonnell Douglas*, 411 U.S. at 802; *Kendrick*, 220 F.3d at 1226.  "The prima facie case serves . . . [to] eliminate[ ] the most common nondiscriminatory reasons for the plaintiff's rejection."  *Texas Dep't of Comty. Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981). Critical in the prima-facie inquiry, in all cases, is whether the plaintiff has demonstrated that the adverse-employment action occurred "under circumstances which give rise to an inference of unlawful discrimination."  *Id.* at 253.  "As the very name 'prima facie case' suggests, there must be at least a logical connection between each element of the prima facie case and the illegal discrimination for which it establishes a legally mandatory, rebuttable presumption."  *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311-12 (1996) (quoting *Tex. Dep't of Cmty Affairs*, 450 U.S. at 254, n.7).  A prima-facie case under *McDonnell Douglas* evokes an inference of discrimination only because the court presumes that it is more probable than not that the employer's

_____

[4]Although there is no Title VII claim being made here, the holdings in the Title VII cases are relevant to this analysis.

actions, if not otherwise explained, were based on consideration of impermissible factors.  *See Notari v. Denver Water Dep't*, 971 F.2d 585, 589 (10th Cir. 1992) (citing *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).  "The firing of a qualified minority employee raises the inference of discrimination because it is facially illogical for an employer to randomly fire an otherwise qualified employee and thereby incur the considerable expense and loss of productivity associated with hiring and training a replacement."  *Perry*, 199 F.3d at 1140.

Once the plaintiff has established a prima-facie case, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for its employment action."  *McDonnell Douglas,* 411 U.S. at 802.  If the defendant makes this showing, the plaintiff must then show that the defendant's justification is pretextual.  *See id.* at 804.  Where a plaintiff "presents evidence that the defendant's proffered reason for the employment decision was pretextual – i.e. unworthy of belief, the plaintiff can withstand a summary judgment motion and is entitled to go to trial."  *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995).  Pretext can be shown through evidence of "weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons," indicating the stated reasons are false.  *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quotation marks and citations omitted).  It can also be shown through evidence that the employer acted contrary to a policy or practice when making the adverse employment decision.  *See Kendrick*, 220 F.3d at 1230.  The court does "not ask whether the employer's reasons were wise, fair or correct; the relevant inquiry is whether the employer honestly believed its reasons and acted in good faith upon them."  *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1118-19 (10th Cir. 2007) (citing *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1120 (10th Cir. 2007)).  The court considers the facts as they appeared to the decisionmaker without second-guessing the decision, even if it seems in hindsight to have been a poor business judgment.

9

*See id.* at 1119.

"[A] plaintiff may also show pretext on a theory of disparate treatment by providing evidence that he was treated differently from other similarly-situated, nonprotected employees who violated work rules of comparable seriousness." *Kendrick*, 220 F.3d at 1232. An employee is similarly situated to the plaintiff if the employee "deal[s] with the same supervisor and [is] subject to the same standards governing performance evaluation and discipline." *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10ᵗʰ Cir. 1997) (internal quotation marks and citation omitted). "A court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated." *Id.* Differences in treatment that are trivial or accidental or explained by a nondiscriminatory motive will not sustain a claim of pretext. *See E.E.O.C. v. Flasher*, 986 F.2d 1312, 1320 (10th Cir. 1992).[5]

---

[5]

Sometimes apparently irrational differences in treatment between different employees that cannot be explained on the basis of clearly articulated company policies may be explained by the fact that the discipline was administered by different supervisors, *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir.1989), or that the events occurred at different times when the company's attitudes toward certain infractions were different, *Grohs v. Gold Bond Bldg. Products*, 859 F.2d 1283, 1287 (7th Cir.1988), cert. denied, 490 U.S. 1036, 109 S. Ct. 1934, 104 L. Ed.2d 405 (1989), or that the individualized circumstances surrounding the infractions offered some mitigation for the infractions less severely punished, *Brazer v. St. Regis Paper Co.*, 498 F. Supp. 1092, 1098 (M.D. Fla.1980), or even that the less severely sanctioned employee may be more valuable to the company for nondiscriminatory reasons than is the other employee, *Langland v. Vanderbilt Univ.*, 589 F. Supp. 995, 1008-09 (M.D. Tenn.1984). Other times, no rational explanation for the differential treatment between the plaintiff and the comparison employees may be offered other than the inevitability that human relationships cannot be structured with mathematical precision, and even that explanation does not compel the conclusion that the defendant was acting with a secret, illegal discriminatory motive. *See Gray v. University of Arkansas*, 883 F.2d 1394, 1401 (8th Cir.1989) ("An employer's articulated reason for terminating a member of a protected class need not be a sound

**D.      Retaliation**

Generally, retaliation in an employment context is not a form of discrimination recognized by the Supreme Court as rising to the level of a constitutional violation.  *See Teigen v. Renfrow*, 511 F.3d 1072, 1086 (10th Cir. 2007) (collecting cases for the proposition that a purely Title VII claim, such as retaliation for filing a discrimination complaint, cannot form the basis for an equal-protection violation).  However, "[a]n act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper."  *DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 1990) (quoting *Matzker v. Herr*, 748 F.2d 1142, 1150 (7th Cir. 1984)).

To demonstrate a prima-facie case of retaliation under § 1981, a plaintiff must show that:

---

business reason, or even a fair one. . . . The only relevant inquiry is whether the decision was based on [a protected status]."). *Cf. Furnco [Constr. Corp. V. Waters]*, 438 U.S. [567,] 577, 98 S. Ct. at 2949-50 [(1978)](implying that irrational disparate treatment is not inevitably premised upon consideration of impermissible discriminatory factors).  Under Title VII, the defendant does not have to prove why the differential treatment occurred; it is up to the plaintiff to prove why it did occur-and to prove that it was caused by intentional discrimination against a protected class.  If, after trial, no motivation or reason for the differential treatment has been established by either side to a preponderance of the evidence, the judgment must be for the defendant . . . .

Indeed, even punishment administered for violating a valid, facially nondiscriminatory policy may be motivated by an illegal discriminatory intent, and if so, it is actionable under *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 283, 96 S. Ct. 2574, 2580, 49 L. Ed.2d 493 (1975). However, it is the province of the fact finder to determine what inferences should fairly be drawn from the facts. *Pullman-Standard[ v. Swint]*, 456 U.S. [273,] 289-90, 102 S. Ct. at 1790-91[ (1982)]. (Rejecting a per se rule of presuming illegal discrimination in the absence of proof of actual discriminatory motive).  An inference of illegal discrimination based upon protected class characteristics is not legally compelled by irrational or accidental disparate treatment between minority and non-minority employees.

*Flasher*, 986 F.2d at 1320-1321.

(1) he or she engaged in protected opposition to discrimination; (2) he or she was subject to materially adverse employment action; and (3) a causal connection exists between the protected activity and the adverse action. *See Somoza v. Univ. of Denver*, 513 F.3d 1206, 1212 (10th Cir. 2008).

> To be an adverse action, the employer's conduct must be materially adverse to the employee's job status. . . . The adverse action must amount to a significant change in employment status, such as firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.

*Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1230 (10th Cir. 2004) (internal citations and quotations omitted). A plaintiff may demonstrate retaliation indirectly by showing that the defendant asserted reasons for the adverse action that are unworthy of belief. *See Roberts v. Roadway Exp., Inc.*, 149 F.3d 1098, 1103 (10th Cir. 1998).

The plaintiff must present sufficient evidence to establish that the adverse employment action was "taken against him in response to the protected activity." *Id.* If a plaintiff bases his complaint on retaliation for having filed a discrimination claim against the defendant, he must show that the defendant knew that there were prior allegations of discrimination against him. *See Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002). To bring a facial retaliation claim, a plaintiff must show that the decision-makers knew of the plaintiff's protected acts. *See Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007). "[T]he absence of a reference to unlawful discrimination . . . can preclude a retaliation claim because an employer cannot engage in unlawful retaliation if it does not know that the employee has opposed or is opposing a [discriminatory action]." *Petersen*, 301 F.3d at 1188.

## DISCUSSION

For his § 1983 claim, Haynes alleges that Dominguez, a state employee, deprived him of his

12

right to equal protection.  Haynes argues that Dominguez intentionally discriminated against him, specifically that he subjected him to discrimination by disciplining him and terminating his employment, because he is African American.  For his § 1981 claim, Haynes asserts that Dominguez interfered with his right to employment with NMDOT by intentionally discriminating against him. Haynes also asserts under both sections that Dominguez retaliated against him for filing a discrimination and harassment claim against Dominguez in 2004.  Haynes argues that Dominguez' discriminatory acts and termination  "were intentional and malicious and were intended to interfere with Plaintiff's right to employment under his contract with NMDOT, and were based upon racial hostility and discrimination against the Plaintiff, who is an African-American."  Compl. ¶ 32 at 7. Dominguez contends that "Plaintiff has failed to provide any evidence of discrimination or retaliation and his case should be dismissed with prejudice."  Doc. 71 at 2.  Because Haynes has not offered direct evidence of discrimination, but instead relies on circumstantial evidence,[6] the claims are analyzed under the burden-shifting framework delineated in *McDonnell Douglas*.[7]

Haynes easily meets the first three elements of the prima-facie case of discrimination.  As an African-American, he is a member of a protected class.  Haynes was qualified for his job, as he

---

[6]At his deposition, Haynes stated that the harassment was indirect.  *See* Haynes Dep. at 98:25-99:12 at 10.

[7]The only document that Haynes provided to the Court in support of his arguments is a copy of his initial Rule 26 disclosures, which is not admissible as evidence and therefore cannot be considered in the Court's analysis herein.  *See* Doc. 79 at 9.  Haynes contends "I have personal knowledge of facts which bear on this case for my request for denial of summary judgement [sic], including Affidavits sign[ed] under oath by fellow employees which could construe perjury." Doc. 79 at 2.  Unfortunately, Haynes has not provided with his filed response, any materials from the record, depositions, affidavits, declarations or other materials in support of his claims.  See FED R. CIV. P. 56(6)(1).  In contrast, Dominguez requested permission to file additional pages with his motion.  But nearly 56 of the additional pages were summaries of exhibits and testimonies from a prior proceeding; therefore, they are inadmissible for consideration herein.

had been employed in that position for some time.  Despite being qualified, he was terminated.  The fourth element was not discussed by either party, and the Court will assume that the position remained available after Haynes' termination.  Because the prima-facie elements are met, the inference is  raised that the termination was based on impermissible factors, *see Notari*, 971 F.2d at 589, and the Court therefore looks to the reasoning provided by Dominguez for Haynes' discipline and termination.

Dominguez states that Haynes was terminated because he received three speeding citations while operating a NMDOT vehicle on productive time and did not immediately report damage to the truck.  *See* Doc. 71, Ex. N ("Dominguez' Aff.") ¶ 5, at 1.  Dominguez asserts that he did not terminate Haynes because Haynes was an African-American.  *See id.*  ¶ 7, at 2.  Dominguez argues that Haynes "received several instances of progressive discipline in an attempt to curb his enthusiasm, including verbal counseling, letters of caution, suspension, and reduction in pay," and that none of it "proved effective."  Doc. 71 at 2.  He continued, "Plaintiff's failure to immediately report the damage he caused to a DOT truck was simply more evidence of his refusal to follow DOT guidelines and procedures."  *Id.*  Dominguez states: "I was concerned that Mr. Haynes [sic] repeated speeding constituted a safety threat to the traveling public and could expose the [NM]DOT to unnecessary liability."  Dominguez Aff. ¶ 6, at 2.[8]  Dominguez contends that Haynes "termination was based on legitimate, non-discriminatory reasons, namely his continued violations of DOT rules

---

[8]The disciplinary letter of July 23, 2002 stated that Haynes was suspended for one work day, specifically July 26, 2002.  *See* Haynes Dep. at 111:19-112:2 at 11; Doc. 71, Ex. G at 1.  On August 15, 2003, Haynes reported that, while driving a NMDOT vehicle, he received a speeding citation in the Village of Hatch, New Mexico.  *See* Haynes Dep. at 112:9-112:15 at 11.  As a result, per the letter of September 11, 2003, Haynes' salary was reduced by fifteen percent for one-hundred-sixty days.  *See* Haynes Dep. at 112:16-113:8 at 11; Doc. 71, Ex. H at 1.  The September 11, 2003 disciplinary letter noted that it was his second suspension for that type of violation.  *See id.*

and regulation." Doc. 71 at 2.

The termination letter listed as a basis for the disciplinary action the March 23, 2007 traffic citation, after which Haynes asserted that the throttle stuck; that he was not able to stop the vehicle; and that he had previously had the vehicle worked on by NMDOT mechanics. Ex. B at 6. It questioned Haynes' credibility because NMDOT had no record of the vehicle being diagnosed or serviced for a sticking throttle prior to that date. *See id.*, Ex. B at 7. The letter noted that when Mr. Chavarria requested, on April 2, that the vehicle be inspected, Haynes indicated that the vehicle was working fine. *See id.*, Ex. B at 7. Chavarria nevertheless insisted that the vehicle be inspected and no problem with the throttle was found. *See id.*, Ex. B at 7: Haynes Dep. at 75:5-75:8 at 7.

The other main basis for the disciplinary activity against Haynes was that Haynes, on April 2, 2007, used and damaged a truck assigned to another employee, but did not immediately report the damage to a supervisor. *See* Doc. 71, Ex. B at 7.

At no time does Haynes assert that he was not speeding at the time of any of the citations or reports or that he did not cause or fail to immediately report the damage to the truck. His contention is that none of the incidents "resulted in a conviction for a traffic offense or a formal complaint by a citizen," but he was nevertheless disciplined for these events. Compl. ¶ 20, at 4. Haynes acknowledges that NMDOT considers driving too fast in a state vehicle unacceptable. *See* Haynes Dep. at 115:22-115:24 at 12. He admits that he was speeding at the time of the September 11, 2003 incident. *See* Haynes Dep. at 70:9-70:23 at 6. He acknowledges receipt of the citations. He further acknowledges that he was disciplined and terminated for speeding and damaging a vehicle. *See* Haynes Dep. at 65:18-68:6 at 4-5; 76:20-77:2 at 7.[9] But, he argues that he was terminated "without

---

[9]Haynes states:

enough just cause because of citation[s] that were dismissed and the Department of Transportation still punished me for citations not even seen by the Department and third party hearsay." Doc. 79 at 1. He contends: "I feel the public was never at danger because of my accusation of reckless driving which has never been proven by defendant other others [sic]." Doc. 79 at 2.

Despite Haynes' assertions, no further "proof" is needed. Ninety percent of Haynes' job involved driving. *See* Haynes Dep. at 100: 6-100:18 at 10. The fact that Haynes reported the damage to the truck within a twenty-four hour period does not minimize the speeding charges against him.[10] While the public complaints[11] were described in the termination letter, they were not the main reason for his termination. His termination is further supported by the fact that Haynes violated multiple NMDOT rules and regulations. *See* Ex. B at 6. The Court therefore finds that Dominguez has met his burden of providing a facially nondiscriminatory reason for firing Haynes. There is no indication the discipline or termination was caused by discriminatory intent. Dominguez

---

On May 17, 2002, I did receive a citation. The reason the officer did not show I explained to him that I just revised the speed limit sign in that area. So I did not admit to speeding the another [sic] reason it was dropped

Doc. 79 ¶ 4, at 3, and "On August 15, 2003 I did receive a citation which was dismissed by the Mayor himself. So why was I punished. Dismissed the same day. Where are these citations." Doc. 79 ¶ 5, at 3.

[10]Haynes contends: "If you check the guidelines thoroug[h]ly you w[ould] see where I reported the accident to the DOT truck within the 24 hours alloted." Doc. 79 at 2. "The accident of DOT state vehicle was reported the follow[ing] day within 24 hours which was 21 hours, on April 4, 2007." Doc. 79 ¶ 3, at 3.

[11]Haynes asserts that the "[p]rivate citizens never came forward . . . June 12 or November 21, 2006. Officer[s] admit they never saw my speeding so why was I reprimanded. Also on November 16, 2006 [i]t was never proven just hearsay even the officer's [sic] in my hearing admitted the[y] never saw me speeding." Doc. 79 ¶ 6, at 3-4. Attached to the motion for summary judgment is a copy of the dispatch record for November 16; it contains the name and contact information for the complainant. *See* Doc. 71, Ex. J.

16

has provided no inconsistent explanations for terminating Haynes. The reasons Dominguez provided for Haynes' termination are "worthy of belief." *See Roberts*, 149 F.3d at 1103.[12]

But Haynes argues that the discipline and termination were pre-textual. He contends that he was a victim of disparate treatment because Hispanics and Caucasians involved in incidents similar to the ones for which he was terminated were not terminated. *See* Haynes Dep. at 61:9-61:16 at 3. Haynes believes that some of the acts by the other non-African-American employees were actually worse than the acts he performed. *See id.* at 61:23-62:1 at 3-4. In support of this contention, Haynes, who was hired as a traffic technician and whose work required him to be out of the office performing field work ninety percent of the time, *see* Haynes Dep. 65:1-65:2 at 4, points to a number of instances where non-African-American employees were convicted of Driving While Intoxicated (DWI) or had damaged vehicles but were not terminated.

Haynes contends that Tom Blake, a Caucasian and the former district manager at NMDOT received multiple DWIs, was demoted in his position and his personnel file was expunged, but in contrast Haynes was terminated and file expungement was refused. *See id.* at 82:1-83:22.[13] Haynes states: "They (DOT) choose [sic] to demote Mr. Blake than terminate him as I think they should of did for me also, being Af[r]o-American and not white." Doc. 79 at 2.[14] In his affidavit, Blake states

---

[12]Hayes makes other references to harassment stating that Dominguez sent people to watch him work, *see* Haynes Dep. at 99:13-100:1 at 10, and discrimination in that he was the only African-American at his pre-termination meeting, *see id.* at 59:5-59:19 at 3. However, these are speculative at best and Haynes provides no support for the substance of these arguments.

[13]In his Response, Haynes argues: "Look at the facts under Directive 628 4.04 as you forgot to submit in your summary. Employee must posse[ss] a valid Driver's License not an inter lock License as in Tom Blake's case for 3 DWI's. And you can be Terminated from employment regardless of personal or state vehicle." Doc. 79 at 2.

[14]When NMDOT temporarily transferred Haynes to another position, Haynes protested the change and filed a complaint against several NMDOT employees, including Dominguez. *See*

that he is currently a purchasing agent advanced for District One of the NMDOT and previously was district administrator for the same district. *See* Doc. 71, Ex. Q. (Doc. 71-18) ("Ex. Q") ¶¶ 1-2, at 1. Blake, who was not a traffic technician, had different supervisors than Haynes. *See* Ex. Q ¶¶ 4, 10 and 16, at 1-2. Blake never received a speeding ticket while driving a NMDOT vehicle and never damaged a NMDOT vehicle. *See id.* ¶¶ 23-24, at 2. He also never received an unfavorable annual performance review during his long tenure with the State of New Mexico. *See id.* ¶ 25, at 2. Blake was, however, convicted of three DWIs during his employment with NMDOT. When Blake was convicted of DWI in 1996, he was not in a state vehicle or on productive time for the state. *See* Ex. Q ¶¶ 15-17, at 2. He reported the incident immediately to his supervisor and was disciplined for the event. *See id.* ¶¶ 16-18, at 2. He was also prohibited from operating a NMDOT vehicle while his license was restricted. *See id.* ¶¶ 19- 20, at 2. In 2003, when he was convicted of his second DWI, Blake was not driving a state vehicle and was not on productive time. *See id.* ¶¶ 9-11, at 1. He reported the incident to his supervisor and was disciplined. *See id.* ¶¶ 10-12, at 1. Blake admits that he was again convicted of DWI in 2007, but still not while driving a state vehicle or on productive time for the state. *See id.* ¶¶ 3-6, at 1. He states that the next day he reported the incident to his supervisor; he was demoted, at his own request; and he is no longer permitted to operate DOT vehicles because of restrictions placed on his driver's license as a result of his DWI convictions. *Id.* Ex. Q ¶¶ 3-8, at 1. Blake further states that the DWIs were never part of his personnel file and therefore could not have been and were not expunged. *See id.* ¶ 27, at 3.[15]

---

Haynes Dep. at 95:11-98:24 at 9-10. He was dissatisfied because working in the sign shop was not what he was hired to do. *See id.* at 98:8-98:10 at 10. The temporary reassignment did not alter his hours or pay, and was not an adverse employment action. *See id.* at 96:21-97:7 at 9.

[15]In his affidavit, Blake admits that, in 1985, prior to his employment with NMDOT, he was also convicted of DWI. *See* Ex. Q ¶ 21, at 2.

Haynes contends that Cedric Jasso, a Hispanic, totaled a dump truck and, as discipline, was given a week off without pay.  *See* Haynes Dep. at 83:23-85:13 at 8.  Haynes asserts that when he returned to work, Jasso applied and was hired for a higher position and received a raise.  *See id.* at 84:10-84:15 at 8.  Haynes states that driving was a regular part of Jasso's work.  *See id.* at 63:2-63:8 at 4.  Jasso's affidavit confirms that, when he was a highway maintenance worker operational for Deming Maintenance Patrol of NMDOT,  he had an accident involving a state-owned dump truck and he was found at fault.  *See* Doc. 71, Ex. S (Doc. 71-20) ("Ex. S") ¶¶ 1-6, at 1.  As a result of the accident, Jasso was disciplined with five days leave without pay and required to attend a defensive-driving course.  *See id.* ¶ 6, at 1.  Jasso testified that this is the only disciplinary action he received while employed with NMDOT; Jasso never caused damage to any other NMDOT vehicle.  *See id.* at  ¶¶ 9-11, at 1-2.  He further states that he has "never been cited for speeding or any other traffic violation while driving a DOT vehicle." *Id.* ¶ 9, at 1.  Jasso's affidavit advises that a year and a half after the accident, he applied for a higher level position within NMDOT.  *See id.* ¶ 7, at 1.

Haynes appeared to also assert in his Complaint that Veronica Trujillo, a Hispanic, was convicted twice of DWI but was not terminated from her position at NMDOT.  *See* Compl. ¶ 25 at 5.  Haynes admits that driving was not a regular part of Trujillo's job and that she only drove for training or if sent into the field to collect information.  *See* Haynes Dep. at 63:16-64:4 at 4.  In her affidavit, Trujillo states that she was never convicted of DWI, *see* Doc. 71, Ex P (Doc. 71-17) ¶¶ 1-6,[16] and Haynes presents nothing to dispute that sworn statement.  She further states that she is a management analyst and indicates that she had a different supervisor than Haynes.  *See id.* ¶¶ 1-3.

---

[16]Trujillo's affidavit confirms that, in 2004, while in her personal vehicle, she was pulled over by police on suspicion of DWI, but that the charges against her were dismissed.  *See* Ex. P ¶¶ 2-5.  She was never convicted of the DWI charges.  *See id.*  She had reported receiving the charges to her supervisor.  *See id.*

Further, Trujillo was never issued a NMDOT vehicle, never received a speeding citation while driving a NMDOT vehicle and never damaged a NMDOT vehicle. *See id.* ¶¶ 7-10.

Finally, Haynes references Carlos Tafoya, a Hispanic, but does not make a clear comparison with him. It appears that Haynes is asserting that Tafoya had an accident with a NMDOT dump truck but was not terminated from his position. According to Tafoya's affidavit, he is a highway maintenance worker operational for NMDOT. *See* Doc. 71, Ex. T (Doc. 71-21) ("Ex. T") ¶ 1, at 1. Haynes was unsure how often Tafoya was required to drive in performing his work, but stated Tafoya worked "special crews." *See* Haynes Dep. at 65:8-65:17 at 4. Tafoya swears that he was trying to drive a NMDOT dump truck out of a muddy arroyo when he was hit by a flash flood. *See* Ex. T ¶¶ 2-4, at 1. Another employee had driven the truck into the arroyo. *See id.* ¶ 2, at 1. Tafoya was found not to be at fault. *See id.* ¶¶ 7-9, at 2. Tafoya was not disciplined for the event. *See id.* ¶ 9, at 2. Tafoya was never issued an NMDOT vehicle, never received a speeding citation while driving a NMDOT vehicle, never received any disciplinary actions during his tenure with NMDOT and never damaged any other NMDOT vehicle. *See id.* ¶¶ 10-13, at 2.

Haynes is not similarly situated with any of these individuals. The fact that they were not terminated under different circumstances or by different supervisors does not establish pretext in this case. Further, Haynes' bad acts were continuing and were relevant to his job position. Even recognizing that, "[w]hen comparing the relative treatment of similarly situated minority and non-minority employees, the comparison need not be based on identical violations of identical work rules; the violations need only be of 'comparable seriousness,'"[17] Haynes' and the other employees' situations are factually distinguishable. A company must be allowed to exercise its judgment in

---

[17]*Elmore v. Capstan, Inc.*, 58 F.3d 525, 530 (10th Cir. 1995) (quoting *Flasher*, 986 F.2d at 1316).

determining how severely it will discipline its employee for different types of conduct. "[The court's] role is to prevent unlawful hiring practices, not to act as a super personnel department that second guesses employers' business judgments." *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs*, 165 F.3d 1321, 1330 (10th Cir. 1999) (quotation marks and citation omitted).

Dominguez has shown that Haynes was fired for a valid reason and not for discriminatory purposes. Haynes has not shown pretext. The record does not show, or even raise a specter of, discriminatory intent. Haynes simply has not presented any evidence that Dominguez discriminated against him based on his race or provided specific facts sufficient to support the reasonable inference that Dominguez terminated him because he is African-American.

Haynes next speculates, citing § 1983 and § 1981, that his termination was in retaliation for a complaint for discrimination and harassment that he filed against Dominguez and several others in NMDOT management in 2004. *See* Compl. ¶¶ 26-29, at 5-6. But a complaint filed in 2004 will not, without more, provide sufficient evidence of retaliation to go to a jury, especially when Haynes committed intervening bad acts that provided a valid basis for termination in 2007. *See Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997) (noting that a plaintiff must demonstrate a causal connection by evidence justifying an inference of retaliatory motive, such as by showing protected conduct closely followed by adverse action, and holding that four-month period between protected activity and adverse action is not sufficient to justify inference of causation); *Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1266 (10th Cir. 2009) (noting that temporal proximity alone is not sufficient to establish a causal connection in Title VII retaliation cases). Haynes can not show a temporal connection and he has not provided any evidence from which an inference could be reasonably drawn that he was terminated in retaliation for his

discrimination claim.  Further, he has not presented anything to show that Dominguez was even

aware that Haynes asserted a discrimination claim against him in 2004.[18]  Dominguez states:

> In 2004 I received a phone call from Jimmy Gomez at the Office of Equal
> Opportunity Programs . . . of the DOT advising me that Mr. Haynes had complained
> to him about being required to work in the District One sign shop in Deming during
> times when his duties as a traffic technician were slow.  *I never received anything
> in writing or any formal complaint from or concerning Mr. Haynes that alleged he
> was being discriminated against.*

Dominguez Aff. ¶ 4, at 1 (emphasis added).  Haynes has presented nothing to contradict this sworn

statement.

**CONCLUSION**

Dominguez has shown that he terminated Haynes for a valid reason, and Haynes has

presented no evidence from which a jury could find pretext or that Dominguez intended to

discriminate or retaliate against Haynes because of Haynes' race.  Haynes has not presented

sufficient facts to create a genuine issue for trial on any of his claims, and Defendant has shown that

he is entitled to judgment as a matter of law.

**IT IS THEREFORE ORDERED** that *Defendant Alvin Dominguez's Motion for Summary

Judgment*, filed November 15, 2010 (Doc. 71) is hereby **GRANTED**.  Plaintiff's Complaint is

dismissed with prejudice.

_____

UNITED STATES DISTRICT JUDGE

---

[18]The Court notes that Haynes had received speeding citations and the progressive
disciplinary process because of his speeding and reckless driving prior to filing his complaint against
Dominguez.

22